UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Plumbers' Pension Fund, Local 130, U.A., *et al.*,

    *Plaintiffs*,

v.

Republic Piping Systems, Inc., *et al.*,

    *Defendants.*

No. 20 CV 774

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiffs, a collection of benefit funds along with Plumbers' Local Union 130, brought this suit against Republic Piping Systems, Inc., John DiFoggio, and Danielle Duarte, under Section 502 of the Employee Retirement Security Act, 29 U.S.C. Section 1132, 1145, ("ERISA") and under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, ("LMRA"). The Funds seek to recover fringe benefit contributions allegedly due to them by Republic.

Before the Court are the parties' cross-motions for summary judgment, [dkt. 179 (Plaintiffs); dkt. 182 (Defendants)], along with Defendants' related Motion for Sanctions [dkt. 185]. For the reasons that follow the motion for sanctions is denied, and the motions for summary judgment are both granted in part and denied in part.

I. **Background**

Unless noted, all facts recounted herein are undisputed either due to the parties' agreement or their failure to cite evidence refuting the fact asserted in the opposing party's Rule 56.1 statement. The Court does not include factual assertions that are unsupported by the parties' citations to record materials. *See* L.R. 56.1(a). In

ruling on cross motions for summary judgment, the Court "draw[s] all reasonable inferences in favor of the party against whom the motion at issue was made." *Chicago Tchrs. Union v. Bd. of Educ. of the City of Chicago*, 14 F.4th 650, 654 (7th Cir. 2021) (citation and internal quotation marks omitted). However, the Court only relays facts that are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). That is, "facts that might affect the outcome of the suit." *Id.*

Plumbers' Pension Fund, Local 130, U.A., Plumbers' Welfare Fund, Local 130, U.A., and Plumbers' Retirement Savings Plan Fund, Local 130, U.A. (collectively, "Funds") receive contributions from numerous employers under Collective Bargaining Agreements ("CBAs") between employers and the Chicago Journeymen Plumbers' Local Union 130, U.A. ("Union"). [Dkt. 192 ¶ 1.] The Funds are multi-employer plans per 29 U.S.C. § 1002, and the Union is a voluntary association and labor organization pursuant to both the National Labor Relations Act and the LMRA. [*Id.* ¶¶ 2–3.]

The Funds previously received contributions from U.S. Plumbing & Sewer, Inc. ("U.S. Plumbing") which had a CBA with the Union. [*Id.* ¶ 4.] U.S. Plumbing, which incorporated in Illinois in 2009, performed commercial, residential, and industrial plumbing work. [*Id.* ¶¶ 5–6.] Defendant John DiFoggio was a 50% shareholder of U.S. Plumbing as well as its President and Director. [*Id.* ¶¶ 7, 10.] U.S. Plumbing's business address was 8400 Wilmette Ave., Darien, IL 60561, which was a garage leased by DiFoggio; but it also used DiFoggio's address on Walter Street in Lemont,

Illinois. [*Id.* ¶¶ 8–9.] DiFoggio owned two cargo vans which U.S. Plumbing used. [*Id.* ¶ 11.]

The CBA between U.S. Plumbing and the Union contains several provisions relevant to this dispute. Section 14.1, entitled "Employer Entities Bound," provides:

> This Agreement is binding upon Employer regardless of whether he or it changes the name or address of his or its business and upon any other business entity within the trade and territorial jurisdiction of the Union which is owned, managed, controlled and/or operated by the Employer or its principals or any of them. This paragraph is intended to apply to the scope of work covered by this Agreement and shall not be construed as adding to the scope of such work.

[*Id.* ¶ 12.] The geographic jurisdiction of the Union set forth in the CBA with U.S. Plumbing covers the "City of Chicago, Illinois, Bureau, Cook, DeKalb, DuPage, Grundy, and Woodford counties, Illinois." [*Id.* ¶ 14.]

The Union set hourly rates of pay for journeymen and apprentice plumbers along with hourly contribution requirement to the Funds. [*Id.* ¶ 15.] To each fund, the employer was required to contribute for each employee covered by the Agreement; for some Funds, contributions were mandatory for apprentices as well. [*Id.*] For example, during the relevant time period, a journeyman plumber could expect to receive between $52.00 and $56.80 per hour in take-home pay and fringe benefit contributions totaling upwards of $33 per hour. [*Id.* ¶¶ 16–23.][1]

---

[1] For these factual assertions, Defendants explained in their response to Plaintiffs' 56.1 statement that they "lack specific knowledge to either admit or deny and therefore deny the same." [*Id.* ¶¶ 16–23.] Local Rule 56.1 requires the party opposing summary judgment to "admit or deny each paragraph and cite to supporting evidence." *Hinko v. Schindler Elevator Corp.*, 2008 WL 2168855, at *1 (N.D. Ill. May 23, 2008). Defendants failed to support their denial of these allegations with evidence. As Plaintiffs' assertion is supported by the evidence they cite in their 56.1 statement, the Court deems these facts as admitted. *Id.*

Fringe benefits—like health insurance and retirement benefits offered by the Funds to Union plumbers—are part of plumbers' wages. [*Id.* ¶ 25.] The CBA gives the Union the right to inspect Employers' payroll records to determine whether the employer is complying with the CBA provisions relating to the contract rate of wages and union dues deductions. [*Id.* ¶ 24.] As intended third-party beneficiaries of the CBA, the Funds also have the power to enforce the CBA's contribution and auditing provisions. [*Id.* ¶ 25.]

On March 8, 2019, after learning U.S. Plumbing was not timely paying its workers, the Union removed its workers from U.S. Plumbing's jobs. [*Id.* ¶ 27.] Pursuant to the CBA, Local 130 Union members could only return to work when U.S. Plumbing remedied its arrearage. [*Id.* ¶ 29.] In March 2019, Union Business Agent James Mansfield observed three non-Local 130 members performing work on a U.S. Plumbing jobsite. [*Id.* ¶ 31.] In response, the Union issued a 5-day Notice Letter to U.S. Plumbing to withdraw all Union employees for failure to pay wages and benefits to employees covered by the CBA. [Dkt. 191 ¶ 1.] Mansfield returned on March 14, 2019 and found two non-Local 130 plumbers, plus DiFoggio and Michael Leuzzi (DiFoggio's partner in U.S. Plumbing), performing and supervising work covered by the CBA. [Dkt. 192 ¶ 32; dkt. 191 ¶¶ 2–3.] As of that date, U.S. Plumbing had not remedied its arrearage and paid all its Local 130 workers in full. [Dkt. 192 ¶ 33.]

On March 21, 2018, the Board of Trustees of the Plaintiff Welfare Fund held a meeting and found that DiFoggio and Leuzzi had engaged in prohibited employment by continuing to work for U.S. Plumbing after the Union enforced its 5-day Notice.

[Dkt. 191 ¶¶ 2–4.] As a result, the Fund terminated DiFoggio and Leuzzi's welfare coverage under its plan on April 1, 2019. [*Id.* ¶ 4.]

On April 4, 2019, the Union's Joint Arbitration Board convened a hearing on charges against U.S. Plumbing for underpaying its Local 130 member employees, for employing non-Local 130 members to perform plumbing work, and for Leuzzi and DiFoggio performing covered work themselves in violation of the CBA's notice of withdrawal to its members. [Dkt. 192 ¶ 34.] The Arbitration Board found U.S. Plumbing guilty and imposed a $50,000 fine. [*Id.* ¶ 35.] U.S. Plumbing did not challenge the findings and never paid the fine assessed. [*Id.* ¶¶ 36–37.][2] U.S. Plumbing never provided timely notice of intent to terminate the CBA. [*Id.* ¶ 26.]

U.S. Plumbing filed for bankruptcy on August 12, 2019. [*Id.* ¶ 65.] At the time, U.S. Plumbing had not completed its payments due to the Funds pursuant to a settlement agreement covering fringe benefit contributions, liquidated damages, and interest. [*Id.* ¶ 68.] The bankruptcy case was closed, and U.S. Plumbing was liquidated on January 16, 2020. [*Id.* ¶ 71.] The Illinois Secretary of State then involuntarily dissolved U.S. Plumbing on November 10, 2020. [*Id.* ¶ 72.] On November 6, 2023, this Court entered an amended judgment in the amount of

---

[2]    Defendants denied Plaintiffs' Statement of Fact #37 but cited no evidence contravening Plaintiffs' assertion. The party opposing summary judgment must do more. *Hinko*, 2008 WL 2168855, at *1. The fact is deemed admitted.

$74,372.16 against DiFoggio for amounts covered by the settlement agreement. [*Id.* ¶ 69.][3] The current balance is $68,372.16. [*Id.* ¶ 70.][4]

In the meantime, DiFoggio started a new company. He incorporated Republic Piping Systems, Inc. ("Republic") on June 19, 2019 in Illinois, and the company received its Plumbing Contractor's License in November 2019. [*Id.* ¶¶ 38–39, 57.] Republic is a business entity within the trade and territorial jurisdiction of the Union. [*Id.* ¶ 49.] DiFoggio is Republic's sole officer, sole shareholder, sole director and is "pretty much in charge of everything" at Republic. [*Id.* ¶¶ 50–52, 120.] Republic never held an annual meeting; has no corporate book or seal; and has never paid dividends. [*Id.* ¶¶ 121–124.]

At the time DiFoggio started Republic, he knew U.S. Plumbing faced a lawsuit from the Plaintiff Funds for delinquent contributions and knew U.S. Plumbing owed the Funds money. [*Id.* ¶¶ 40–41.] He also understood the company was "in a lot of trouble" and filing for bankruptcy. [*Id.* ¶ 42.] Republic's purpose was to allow DiFoggio "to continue to be a plumber and an owner of a plumbing company after U.S. Plumbing could no longer be in business." [*Id.* ¶ 81.]

Republic, like U.S. Plumbing, performs commercial, residential, and industrial plumbing work. [*Id.* ¶ 43.] It also uses the same addresses as U.S. Plumbing in Darien and Lemont. [*Id.* ¶¶ 44–45.] The Lemont address is DiFoggio's former home. [*Id.* ¶ 46.] Republic uses the same registered agent and same accountant as U.S

---

[3]    Defendants dispute this statement of fact but again fail to cite specific evidentiary material refuting Plaintiffs' assertion. The Court deems this fact admitted.
[4]    Defendants challenge this assertion as well but cite no evidence in support. The Court deems the fact admitted.

Plumbing. [*Id.* ¶¶ 47, 66–67.] DiFoggio is also the "IDPH licensed plumber" for Republic, just as he was for U.S. Plumbing. [*Id.* ¶¶ 48.][5] Republic uses some of the same equipment that U.S. Plumbing did, including two Chevy Express Cargo Vans and DiFoggio's plumbing tools. [*Id.* ¶¶ 54–55.] On its website, Republic claims to have been in business for more than 20 years. [*Id.* ¶ 58.]

On or around May 2, 2019, about a month before Republic was incorporated, DiFoggio signed a proposal on behalf of Republic for a project entitled: Meet Me on Meachum. [*Id.* ¶ 56.] DiFoggio signed a letter of intent for the same project using U.S. Plumbing's letterhead on August 6, 2019. [*Id.* ¶ 59.] The letter of intent indicated U.S. Plumbing had been awarded the project. [*Id.* ¶ 63.] The same day, the general contractor for the project submitted a Project Information Sheet to the Village of Schaumburg indicating U.S. Plumbing would be the plumbing subcontractor on the project. [*Id.* ¶ 60.] On March 13, 2020, Republic received a $31,500 check for its work on the Meet Me on Meachum project. [*Id.* ¶ 64.]

Republic hired an apprentice plumber, Brandon Atkins, in March or April 2021. [*Id.* ¶¶ 74, 76.] DiFoggio was his only supervisor. [*Id.* ¶ 75.] When Atkins started working for Republic he earned $25.00 per hour with no fringe benefits. [*Id.* ¶ 76.] When he left in August 2023, he was earning $28.00 per hour without fringe benefits. [*Id.* ¶ 77.] From April 2021 through August 2023, Republic paid its journeyman plumbers between $30.00 and $35.00 per hour in take-home pay; it did not provide health insurance or retirement benefits. [*Id.* ¶¶ 78–79.] Republic has

---

[5] Defendant also denied Plaintiffs' Statement of fact #48, citing no evidence. For the reasons already explained, this fact is deemed admitted as well.

never contributed to the Funds. [*Id.* ¶ 80.] It disclaims any affiliation with the Union or obligation to contribute to the Funds. [Dkt. 191 ¶ 9.]

Republic's only bank account is at Marquette Bank. [Dkt. 192 ¶ 82.] DiFoggio had a personal bank account at Marquette which, at the time of his deposition in August 2024, had a balance of roughly $200.00. [*Id.* ¶ 83.] DiFoggio and his girlfriend, Danielle Duarte, have signatory authority for the accounts as well as debit cards for the accounts. [*Id.* ¶¶ 84–85.] DiFoggio added Duarte to the Republic bank account after she loaned him money to redeem his house from foreclosure. [*Id.* ¶¶ 87–88.] DiFoggio explained that, in the event he died, he wanted Duarte to be able to recoup the loans she made him. [*Id.* ¶ 88.][6] There were no formal loan agreements between the two of them. [*Id.* ¶ 89.] Durate had no position with or ownership of Republic. [*Id.* ¶¶ 90–91.] Neither Duarte nor Republic received regular paychecks from Republic's business checking account. [*Id.* ¶ 92.]

DiFoggio repeatedly drew from Republic's bank account to pay for vacations, his children's school tuition, personal vehicles, brand-name clothing, dinning at high-end restaurants, gambling, and other personal expenses. [*Id.* ¶¶ 93–113.] Republic's articles of incorporation show that, at founding, the amount of paid-in capital was $1.00. [*Id.* ¶ 115.] The initial $10,000.00 deposit into Republic's bank account on June 27, 2019 consisted primarily of a loan from DiFoggio's aunt. [*Id.* ¶ 116.] DiFoggio

---

[6]  Defendants deny Plaintiffs' Statement of Fact #88 but, as before, cite no supporting material. Plaintiffs' statement of fact is supported by DiFoggio's deposition testimony. Therefore, the Court treats the fact as admitted.

needed the loan from his aunt because, at the time, he was "barely surviving" financially. [*Id.* ¶ 118.]

## II. Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. On the other hand, summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

## III. Analysis

Before diving into the ERISA contribution claims at issue in the parties' competing motions for summary judgment, the Court turns to Defendants' motion for sanctions based on discovery deficiencies. [Dkt. 195.]

### A.      Motion for Sanctions

Defendants move for sanctions arguing that Plaintiffs should be prohibited from using, in support of their motion for summary judgment, evidence they failed to properly disclose during discovery. Federal Rule of Civil Procedure 26(e)(1) provides that a party that has made an initial disclosure under Rule 26(a) has a duty to "supplement or correct its disclosure or response … in a timely manner if the party learns … the disclosure … is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). Federal Rule of Civil Procedure 37(c)(1) provides for penalties for failure to comply with Rule 26(e)(1): the party cannot use the information it failed to disclose "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Barnett v. Menard, Inc.*, 851 F. App'x 619, 623 (7th Cir. 2021).

In September 2020, Plaintiffs made their Rule 26 disclosures listing several individuals likely to have pertinent information. [Dkt. 185-2.] They never updated their disclosure. [Dkt. 185.] During the course of litigation, Plaintiffs provided answers to interrogatories, identifying people with knowledge in specific areas. [*Id.*] In support of their summary judgment motion, though, Plaintiffs include declarations from three people whose names were not included in their Rule 26 disclosures or in answers to interrogatories: Christopher Anish, James Mansfield, and Brandon Atkins. [*Id.* at ¶¶ 12–14.] They also support their summary judgment motion with

two documents not included in discovery. [*Id.* at ¶¶ 15–16.] Among other things, Defendants argue that Plaintiffs should not be permitted to rely on this information.[7]

### 1.    Christopher Anish

To understand the scope of the dispute, the Court begins with the first challenged witness: Christopher Anish. Anish is the field representative for the Union. [Dkt. 187 at 4.] At the time Plaintiffs made their Rule 26 disclosures, they listed then-field representative Anthony Rottman. [Dkt. 185-2.] Anish took over Rottman's job in April 2023. [Dkt. 187 at 5.] While Plaintiffs never updated their Rule 26 disclosures, they included a declaration from Anish in support of an earlier filed motion for partial summary judgment. [*Id.*] The Court ultimately struck that motion, permitting the parties additional time to conduct discovery. [*Id.* at 3.] Defendants never sought to take either Rottman or Anish's deposition. [*Id.* at 4, 5.]

While Defendants challenge Plaintiffs' use of Anish's deposition, they admit the vast majority of Plaintiffs' Rule 56.1 statements of fact that rely on Anish's declaration. [Dkt. 192 ¶¶ 4, 13–15, 24–26, 68, 73.] As the *Barnett* court explained in a slightly different context, by admitting most of the factual allegations from Anish, defendants waived their objection. 851 F. App'x at 623. In *Barnett*, the plaintiff opposed the defendant's use of an exhibit that was not produced during discovery;

---

[7]    With respect to all three declarations, Defendants argue that Plaintiffs should be prohibited from relying on them because they didn't produce them in discovery. Not so. "Rule 56 contemplates the creation of affidavits in support of a party's motion for summary judgment and does not require that the party produce the affidavit in advance of filing its motion." *L.W. v. United Skates of Am., Inc.*, 2019 WL 3946068, at *1 (S.D. Ind. Aug. 21, 2019); *see also* Fed. R. Civ. P. 56(c) (discussing procedure for citing to declaration "made for purposes of the motion only").

however, the plaintiff "affirmatively stat[ed] in the pretrial order that he had no objections to any of [defendant's] exhibits." *Id.* The Seventh Circuit found the district court did not abuse its discretion by treating the admission as a waiver. *Id.* The Court reaches the same conclusion here. Defendants' complaint about Plaintiffs' failure to disclose Anish in an amended Rule 26 disclosure rings hollow when they agree with most of Anish's factual assertions.

Turning to the few factual assertions that Defendants challenge, in addition to failing to support their denials with record evidence as required by Local Rule 56.1. [dkt. ¶¶ 16–23, 70], the Court cannot conclude that Plaintiffs were obligated to supplement their disclosure with respect to Anish. *Thuet v. Bd. of Educ. of City of Chicago*, 2022 WL 17098223, at *2 (N.D. Ill. Nov. 21, 2022) (holding there is no duty to update Rule 26 disclosures where the opposing party learns of potential witnesses through another manner); *Pryor v. City of Chicago*, 2010 WL 431470, at *9 (N.D. Ill. Feb. 1, 2010) (reaching the same conclusion where the potential witness's name was disclosed in the footnote of a motion to reconsider). In this case, the partial motion for summary judgment made Defendants aware of Anish by attaching a similar declaration. Fact discovery remained open for several months after the disclosure giving Defendants sufficient time to take action.

Even if Plaintiffs had a duty to update their disclosures, any failure to do so was harmless. *Barnett*, 851 F. App'x at 623. The relevant factors are "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad

faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). As explained, given the prior partial summary judgment motion, Anish's declaration should not have been a surprise; even if it was, Defendants could have filed a motion to reopen discovery in order to take Anish's deposition before responding to Plaintiffs' summary judgment motion; doing so would have cured any prejudice; and, because this case is still in a pre-trial posture, Anish's late disclosure would not disrupt trial. On the last factor, bad faith, Defendants point to no convincing evidence. In sum, the relevant factors weigh in favor of finding Plaintiffs' use of Anish's declaration to support their summary judgment motion is harmless.

### 2.    James Mansfield

James Mansfield is the Union Business Agent who enforced the 5-day Notice issued to U.S. Plumbing and who testified at the Joint Arbitration Board hearing. Plaintiffs did not include Mansfield on their Rule 26 disclosures. Defendants served Plaintiffs with interrogatories, one of which asked Plaintiffs to identify everyone who investigated "the Defendant at Plaintiff's request." [Dkt. 188-1 ¶ 7.] Plaintiffs listed William Wilkins and Joseph Mondia but not Mansfield. [*Id.*]

Similar to Anish, Defendants admit the vast majority of Plaintiffs' statements of fact that rely on Mansfield's declaration. In fact, there is only one assertion which they deny: that U.S. Plumbing never paid any of the fines assessed by the Joint Arbitration Board. [Dkt. 193 ¶ 37.]

Plaintiffs were not obligated to update their Rule 26 disclosures with respect to Mansfield. As they point out, they produced in discovery arbitration documents

that reflected Mansfield's role in investigating U.S. Plumbing. [Dkt. 187 at 6–7.] When an opposing party is put on notice of a potential witness through the discovery process, courts find no obligation to update Rule 26 disclosures. For example, in *Gutierrez v. AT&T Broadband, LLC*, the Seventh Circuit agreed with the district court that plaintiffs were put on notice of a potential witness with pertinent information after another witness mentioned their name during a deposition. 382 F.3d 725, 732 (7th Cir. 2004). The Court emphasized that a party's "obligation to seasonally supplemental their Rule 26(a) disclosures" only arises when the information has not been made known through the discovery process. *Id.*; *see also Pryor*, 2010 WL 431470, at *9.

Here, Defendants specifically sought through discovery the arbitration materials that mentioned Mansfield's role in the Union's investigation of U.S. Plumbing. In addition, Defendants *observed* Mansfield's testimony before the Arbitration Board first-hand. A defendant cannot turn a blind eye to this type of information only to complain later over a technicality.

### 3. Brandon Atkins

Brandon Atkins was a Republic employee and DiFoggio's direct report. [Dkt. 192 ¶¶ 74–76.] Plaintiffs' Rule 26 disclosures did not list Atkins by name; however, it included as a category of potential witnesses, "[o]ther current or former employees of U.S. Plumbing & Sewer, Inc., or Defendant who were employed by either entity during the relevant period." [Dkt. 185-2 at 3.] It took time for Plaintiffs to obtain Atkins' declaration, which they produced to Defendants immediately after receipt, but on the eve of the close of discovery. [Dkt 187 at 51.] Even if Plaintiffs were

14

obligated to do more, Defendants waived their challenge by admitting every factual assertion in Plaintiffs' Statement of Facts that relies on Atkins' declaration. *Barnett*, 851 F. App'x at 623.[8]

### 4. Exhibits

Defendants challenge the use of two exhibits Plaintiffs failed to produce in discovery. [Dkt. 185 at 2.] The first, Exhibit L, is a collection of screenshots from Republic's website. The second, Exhibit R, are screenshots from another website purporting to show that Leuzzi is now part of a cannabis dispensary venture. Defendants argue they had no duty to disclose the website printouts because they "can only be the handiwork of DiFoggio or persons directed by him." [Dkt. 187 at 9.] That answer is not compelling, particularly with respect to Exhibit R. The bigger issue though is that, once again, Defendants admitted both of Plaintiffs' statements of fact that rely on these challenged exhibits. [Dkt. 192 ¶¶ 58, 73.] This constitutes waiver of Defendants' argument in their motion for sanctions, as previously explained. However, because Leuzzi's current employment, represented through Exhibit R, is not material to this dispute, the Court will not consider it in resolving the parties' motions. In contrast, Exhibit L is material and, given Defendants' admission of the relevant facts contained in in, the Court will consider it.

---

[8] The parties' briefs also discuss Leuzzi, who was DiFoggio's partner in U.S. Plumbing. [Dkt. 187 at 8; dkt. 188 at 4.] The basis of that dispute is not clear to the Court since Plaintiffs did not support their motion for summary judgment with evidence from Leuzzi. Even if Plaintiffs' Rule 26 disclosures were inadequate in some way with respect to Leuzzi, any failure to disclose is harmless because Plaintiffs' summary judgment motion does not rely on information from Leuzzi. Furthermore, like Atkins and Mansfield, Defendants were on notice that their employees and directors could have information relevant to this dispute.

### 5.    Miscellaneous Discovery Issues

Defendants' motion for sanctions complains of other discovery issues, such as allegedly deficient interrogatory responses and deficient document productions with respect to the Union. The time for complaining about the sufficiency of discovery responses has long passed. Discovery closed last September. As Plaintiffs explain, after making their last production on August 13, 2024, Defendants never challenged the sufficiency of the production or filed a motion to extend or reopen discovery.  [Dkt. 187 at 3–4.]

Defendants admit they did not attempt to take the depositions of any of the individuals included on Plaintiffs Rule 26 disclosures. [Dkt. 188 at 8.] They "did not believe it necessary based on the witnesses provided and the documents produced." [*Id.*] But they offer no reason to believe that, had Plaintiff updated their disclosures with different witnesses, their decision would have been different. As previously explained, Plaintiffs had no obligation to do so.

There were many steps Defendants could have taken if they believed Plaintiffs' discovery practices deprived them of the ability to mount a robust response to Plaintiffs' summary judgment motion. They took none of them. Instead, Defendants waited and now attempt to use discovery complaints to argue Plaintiffs' motion for summary judgment should be struck in its entirety. Given the context, sanctions are not appropriate. Defendants' motion is denied.

### B.    Cross Motions for Summary Judgment

Plaintiffs bring several claims seeking the same relief: to hold Republic responsible for contributions as a continuation of U.S. Plumbing. They seek to hold

Republic liable as U.S. Plumbing's alter ego under ERISA (Count I), and as U.S. Plumbing's successor-in-interest under the CBA and under Illinois law (Count II and III). They also bring a veil piercing claim to establish DiFoggio's liability for Republic's debts.[9]

Before reaching Plaintiffs' claims, though, the Court will address a few of Defendants' arguments in support of their own summary judgment motion because they go to the predicate issue of the enforceability of the CBA. Defendants' principal argument is that the CBA was either terminated or modified through conduct to the point of no longer necessitating compliance with its contribution requirement provisions. [Dkt. 194 at 2–3.] They argue that the CBA was terminated when the Welfare Fund terminated DiFoggio's coverage in April 2019. [Dkt. 191 at ¶ 4.] Defendants point to a copy of the termination letter DiFoggio received from the Welfare Fund and argue that "the Union cannot accept contributions for benefits it has no intention of providing." [Dkt. 184 at 3.] They cite no law in support of that argument, nor any provision of the CBA or Trust Fund agreement.

To begin, the Union and Funds are separate entities, as will be explored more below. As a result, a letter terminating Welfare benefits is not competent evidence that the CBA—a separate agreement entirely—has been terminated. At the summary judgment stage it is incumbent on Defendants to do more. They must "show

---

[9]     Plaintiffs originally brought a veil piercing claim for Duarte but dropped that in briefing the motions for summary judgment. [Dkt. 193 at 10.] Therefore, summary judgment is entered in Defendant Duarte's favor on that claim. *Wilkinson v. Acxiom Corp.*, 611 F. Supp. 3d 547, 555 (N.D. Ill. 2020); *Norwood v. Aurora Health Care, Inc.*, 2022 WL 2657133, at *4 (E.D. Wis. July 8, 2022).

what evidence [they] ha[ve] that would convince a trier of fact to accept [their] version of events." *Wade*, 26 F.4th at 446. In support of their termination argument, Defendants come up empty.

Defendants also argue that the parties modified the CBA by not acting in accordance with it, such as by not pursuing arbitration with Republic in accordance with the CBA. [*Id.* at 4.] In support, they point to Plaintiffs' interrogatory response asking for "all documents relating to the status of John DiFoggio and U.S. Plumbing within Plaintiff's [sic] organization." [*Id.* at 4.] Plaintiffs only produced the Welfare Fund benefit cancellation letter. From that limited production, Defendants argue that the Court can infer that the Union stopped enforcing the CBA and therefore modified it. [*Id.*] They reason that if the Union had truly believed the CBA was in force, they would have taken some steps in accordance with it, and there would be a corresponding paper trail.

This argument is not compelling. First, "Defendant cites no cases establishing that, despite a signed collective bargaining agreement, a union's course of dealings can negate the existence of such agreement." *Bd. of Trs. of Masons & Plasterers Pension Fund Loc. 56 Dupage Cnty., IL v. O'Donnell Plastering, Inc.*, 2003 WL 174207, at *6 (N.D. Ill. Jan. 27, 2003). Furthermore, "misconduct or breach by the union does not relieve the employer of its obligations to make pension contributions." *Id.* The fact that Plaintiffs didn't wield the CBA to hold Defendants to their bargain does not excuse Defendants' contribution requirements.

The remainder of Defendants' arguments will be addressed in conjunction with Plaintiffs' arguments in favor of summary judgment.

### 1.    ERISA Alter Ego

If Republic is an alter ego of U.S. Plumbing it is "obligated to honor the pension contribution terms of the [CBA]." *Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir. 1990). The alter ego theory reasons that if "a new company is one and the same as the old company," the new company violates ERISA if it fails "to comply with the contractual obligations of the old company." *E. Cent. Illinois Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 962 (7th Cir. 2021). In that way, alter ego liability is a form of direct liability. *Plumbers' Pension Fund, Loc. 130, U.A. v. Pellegrini Plumbing, LLC*, 2023 WL 264392, at *3 (N.D. Ill. Jan. 18, 2023). Its purpose is to "prevent an employer from gaining an unearned advantage in his labor activities simply by altering his corporate form." *Sloan*, 902 F.2d at 596 (cleaned up). "The alter ego determination 'focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'" *Teamsters Loc. Union No. 727 Health & Welfare Fund v. De La Torre Funeral Home & Cremation Servs., Inc.*, 2023 WL 4664918, at *5 (N.D. Ill. July 20, 2023) (quoting *Int'l Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987)).

Courts look at a variety of non-exhaustive factors to determine whether the alter ego doctrine applies: "whether the companies have 'substantially identical management, business purpose, operation, equipment, customers, supervision, and

ownership.'" *Id.* (quoting *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998)); *NECA-IBEW Pension Tr. Fund v. Bays Elec., Inc.*, 894 F. Supp. 2d 1071, 1084 (C.D. Ill. 2012). "[U]nlawful motive or intent are critical inquiries in an alter ego analysis." *Trs. of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Loc. 701 v. Favia Elec. Co.*, 995 F.2d 785, 789 (7th Cir. 1993). Courts should consider: "1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity." *De La Torre Funeral Home & Cremation Servs., Inc.*, 2023 WL 4664918, at *6 (N.D. Ill. July 20, 2023) (cleaned up). The analysis, while fact intensive, "boil[s] down to a simple question: despite two entities' legal separation, does the evidence suggest they are one and the same?" *McCleskey v. CWG Plastering, LLC*, 897 F.3d 899, 903 (7th Cir. 2018).

In this case, Plaintiffs point to evidence that DiFoggio substantially managed both businesses. He supervised work performed on U.S. Plumbing jobsites and was the sole supervisor at Republic. [Dkt. 192 ¶¶ 32, 75; dkt. 191 ¶¶ 2–3.]

It is undisputed that the two businesses had the same purpose. They were both engaged in commercial, residential, and industrial plumbing work in the same geographic area. [Dkt. 192 ¶¶ 5–6, 43.] Both businesses used the same equipment. They used plumbing tools owned by DiFoggio, the same Chevy cargo vans, and the same garage space in Darien, Illinois. [*Id.* ¶¶ 8–9.] Both businesses were also

associated with DiFoggio's personal address in Lemont. [*Id.* ¶¶ 44–46.] DiFoggio was the legally required licensed journeyman plumber for both businesses too. [*Id.* ¶¶ 48.]

Because the two businesses did the same type of plumbing work, they shared at least one customer—the Meet Me on Meachum project. DiFoggio represented through a letter of intent that Republic had been awarded the project [*Id.* ¶¶ 59–63.] However, the general contractor believed the subcontractor was U.S. Plumbing. [*Id.* ¶ 60.] When time came around for payment though, it was Republic that received funds for completing that project. [*Id.* ¶ 64.] In that way, Republic performed a contract U.S. Plumbing entered into with a customer.

Both businesses utilized the same registered agent and same accountant. [*Id.* ¶¶ 47, 66–67.] DiFoggio was the president, director, and 50% shareholder of U.S. Plumbing. [*Id.* ¶¶ 7, 10.] His role is quite similar with Republic, except he has full ownership of the business. [*Id.* ¶¶ 50–52, 120.] Contrary to Defendants' argument, DiFoggio's partial ownership of U.S. Plumbing does not prevent application of the alter ego doctrine. *See, e.g., McCleskey*, 897 F.3d at 904; *Laborers' Pension Fund v. Innovation Landscape, Inc.*, 2019 WL 6699190, at *10 (N.D. Ill. Dec. 9, 2019). Courts look beyond titles and examine evidence evincing control over the businesses. *McCleskey*, 897 F.3d at 904. Further establishing continuity, Republic advertises on its website that it has been in business for 20 years despite opening in 2019. [*Id.* ¶¶ 57–58.] In that way, Republic represents work done by DiFoggio under the U.S. Plumbing brand as its own.

The final factor, intent to avoid labor obligations, is the most challenging. The Funds point to how U.S. Plumbing used non-Union labor to continue working after receiving a 5-day notice from the Union. [*Id.* ¶¶ 31–32.] Republic pays its workers below Union wages, without health insurance or benefits. [*Id.* ¶¶ 76–79.] The timing is also instructive: DiFoggio founded Republic knowing that his prior business was being sued for owed contributions and was filing for bankruptcy. [*Id.* ¶¶ 40–41.] He began working under the Republic name and, in fact, incorporated Republic, before U.S. Plumbing filed for bankruptcy. [*Id.* ¶¶ 38–39, 56, 65.] The upshot is that he owned the two businesses at the same time.

At his deposition, DiFoggio explained that he started Republic so that he could continue owning and operating a plumbing company after "U.S. Plumbing could no longer be in business." [*Id.* ¶ 81.] He understood that U.S. Plumbing was "in a lot of trouble." [*Id.* ¶ 42.] Other than the outstanding contribution requirements and timely payment obligations under the CBA though, neither party offers another reason why U.S. Plumbing could not continue its business.

The desire to "start fresh without union involvement" is not evidence of anti-Union animus or intent to avoid labor obligations. *De La Torre Funeral Home & Cremation Servs., Inc.*, 2023 WL 4664918, at *6. In *De La Torre*, the court found alter ego liability inapplicable. There, a family-owned funeral home business, De La Torre, was at issue. De La Torre was a Union company which entered into a settlement agreement with Funds for unpaid contributions. *Id.* at *2. Some, but not all required payments were made in accordance with the agreement. *Id.* After the patriarch of the

family died, De La Torre closed, and some family members opened a new business, Logan Square Funeral Home as a non-Union business. *Id.* at *2-3. While the court recognized the "many similarities between Logan Square and [De La Torre]," it found the Funds fell short of their summary judgment burden with respect to fraudulent intent. *Id.* at *6. Rosa, the matriarch of the family, expressed her desire to run a non-Union business after the death of her husband, explaining "[her] husband had a very bad experience with the union," that she believed it put a "strain" on him and "contributed to his death," and, as a result, she "didn't want to have anything to do with [the Union]." *Id.* The Court also found that "Rosa may have believed the issue [with De La Torre's settlement agreement payments] was resolved." *Id.* All these facts led the court to conclude that while the timing of Rosa opening Logan Square could be perceived as suspicious, the Funds failed to establish fraudulent intent beyond dispute. *Id.*

Courts often apply the doctrine where there is evidence that avoiding "Union costs w[as] a motivating factor" in the decision to close to old business and open the new one. *Trs. of the Chicago Painters & Decorators Pension Fund v. John Kny Painting & Decorating, Inc.*, 188 F. Supp. 3d 760, 775 (N.D. Ill. 2016). In a similar vein, several courts have found statements expressing the infeasibility of continued business operations to be evidence of anti-Union animus where, besides the CBA obligations, there was no evidence the business was in distress. That was true in *Sloan* where, within months of executing CBA, the business owner decided "he couldn't stay in business under the contract" because it "prevented him from being

able to make competitive bids for residential work." 902 F.2d at 595. After his efforts to cancel the CBA were unsuccessful, he had his wife create a new non-Union entity. *Id.* While he argued his motivation was to save his business, he cited only his "company's union obligations as the reason" why his business was struggling. *Id.* Similar facts led to the same conclusion in *Innovation Landscape.* The Court found evidence of intent to avoid collective bargaining obligations where the business owner opened a new business because the prior business was "having problems" but "[t]he only problems alleged [were] the funds' lawsuits." 2019 WL 6699190, at *8. The owner also "blamed the union for [the business's] closure, stating that 'the Union went really dirty on [him].'" *Id.*

In contrast, the Seventh Circuit held the alter ego analysis inapplicable where a non-Union company terminated its affiliation with a Union company, through which contributions had been made for work performed by the non-Union company. *Trs. of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Loc. 701 v. Favia Elec. Co.*, 995 F.2d 785, 786-87 (7th Cir. 1993). Because the non-Union company's "decision to terminate the relationship was motivated by valid business concerns," not to avoid the obligation to contribution to fringe benefit funds, the Court found it was not an alter ego of the Union company. *Id.* at 789.

With this guidance in mind, the Court concludes that a reasonable fact finder could find the alter ego doctrine inapplicable. Though a close call, the evidence shows DiFoggio believed continuing U.S. Plumbing was impossible and the only barrier was the company's Union obligations. Unlike the defendant in *Innovation Landscape*,

24

however, DiFoggio did not say anything overtly negative about the Union; he didn't explicitly blame the Union for the closure of U.S. Plumbing. *See also Boards of Trs. of Bricklayers Loc. 74 Fringe Ben. Funds v. Michael J. Vorkapic, Inc.*, 2001 WL 649501, at *5 (N.D. Ill. June 8, 2001) (considering defendant's statement that he had "nothing but … trouble" with the Union as evidence in favor of applying alter ego doctrine). Further, DiFoggio didn't explicitly connect the infeasibility of U.S. Plumbing's continued operations with its Union obligations. *See John Kny Painting & Decorating, Inc.*, 188 F. Supp. 3d at 775 (where defendant explicitly connected closure of business with "Union costs"). Unlike the defendant in *Sloan*, DiFoggio did not seek to terminate the CBA or admit that cancelling the contract was the only way to stay in business. 902 F.2d at 595. While perhaps a fair inference, it is not the only reasonable conclusion one might reach. As Defendants note, DiFoggio is repaying, albeit slowly and through an installment plan, a settlement related to U.S. Plumbing's failure to pay contributions for a certain period of time. Similar to Rosa in *De La Torre*, it's possible a fact finder could conclude DiFoggio believed his obligation was satisfied and he was free to proceed with running a non-Union plumbing company. 2023 WL 4664918, at *6.

Ultimately, questions of fact linger, making summary judgment inappropriate on Plaintiffs' alter ego theory of liability.

### 2. Successor in Interest

Plaintiffs bring two styles of successor claims seeking to hold Republic liable as the successor in interest to U.S. Plumbing. The first claim, Count II, argues that Republic "is liable as the 'successor' [of U.S. Plumbing] within the meaning of the

collective bargaining agreement." *Pellegrini Plumbing, LLC*, 2023 WL 264392, at *4. The second successor claim, Count III, arises under Illinois state law.

### i.   CBA Successor Claim

"LMRA § 301 vests the district courts with concurrent authority to entertain suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." *RiverStone Grp., Inc. v. Midwest Operating Eng'rs Fringe Benefit Funds*, 33 F.4th 424, 430 (7th Cir. 2022) (cleaned up). As "third-party beneficiaries of the [CBA]," "trust fund beneficiaries can sue under Section 301" for damages. *Id.* at 427 n.8.

Normally, "[t]o succeed on a section 301 claim, a plaintiff must allege that he exhausted the relevant grievance procedures before filing suit in federal court." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1039 (7th Cir. 2023). However, "the presumption of arbitrability" does not extend to "whether arbitration agreements between the union and the employer apply to disputes between [funds] and employers." *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 372 (1984). Instead, "courts must carefully examine the pertinent trust and collective bargaining agreements to determine whether [the] parties intended to arbitrate disputes between trust funds and employers." *Pipe Fitters' Welfare Fund, Loc. Union 597 v. Mosbeck Indus. Equip., Inc.*, 856 F.2d 837, 840 (7th Cir. 1988).

The dispute resolution section of the CBA in this case provides that "[t]he parties hereto agree that all arbitrable disputes arising between them shall be submitted to a Joint Arbitration Board." [Dkt. 180-4 at 14.] It also provides that "[i]n the event of an alleged contract violation" a Union representative "will notify the

Employer … and attempt to resolve the matter informally"; otherwise, unresolved matters will be sent to the Union's Joint Arbitration Board. [*Id.* at 15.] Nowhere does the agreement indicate that Funds have "[]either the duty []or the right to exhaust grievance and arbitration procedures before filing [suit]." *Trs. of NECA-IBEW Pension Ben. Tr. Fund v. Springman*, 2008 WL 360833, at *4 (S.D. Ill. Feb. 8, 2008). In fact, as Plaintiffs note, the CBA excludes coverage of disputes surrounding fringe benefits. [Dkt. 193 at 4, fn.2.] With respect to amounts found owed following fringe benefit audits, the CBA explains those "shall be determined by the audit and collection policy of the Fringe Benefit Funds." [Dkt. 180-2 at 23, § 3.3.]

Courts will typically review the Funds' trust agreements as well to determine if any intent to arbitrate can be derived. *Mosbeck Indus. Equip., Inc.*, 856 F.2d at 840. While Plaintiffs attach a copy of a 2017 trust agreement to their opposition to Defendants' motion for summary judgment, neither party directs the Court to any provision cutting one way or the other on the exhaustion issue. [Dkt. 189-1 at 62–192.] It's not the Court's job to scour the documents on Defendants' behalf for evidence of Funds' ability or duty to exhaust claims using the Union's grievance procedures. *Lane v. Structural Iron Workers Local No. 1 Pension Trust Fund*, 74 F.4th 445, 452–53 (7th Cir. 2023) (litigants are "best positioned and best motivated to provide more information in support of [their] claim.") Exhaustion is an affirmative defense on which Defendants bear the burden. *St. Alexius Med. Ctr. v. Roofers' Unions Welfare Tr. Fund*, 2017 WL 465476, at *10 (N.D. Ill. Jan. 31, 2017); *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 730 (7th Cir. 2007). They must

27

live with the result of their decision not to cite and rely on the Funds' trust agreements.

As Defendants repeatedly emphasize, however, the Union is also a Plaintiff in this action. Inclusion of the Union seems to have been a clerical error. [Dkt. 189 at 16, fn.2.] Funds, not Unions, are "the real parties in interest" in contribution cases like this one. *Line Constr. Benefit Fund v. Asomeo Env't Restoration Indus., LLC*, 688 F. Supp. 3d 727, 735 (N.D. Ill. 2023) (collecting cases). Unions aren't necessary parties to contribution cases. *Id.* The relief sought would flow to the Funds in the form of owed and unpaid contributions, not to the Union. *Id.* Still, Defendants argue that the Union was obligated to exhaust its claims against Plaintiffs using the procedures set forth in the CBA. Sidestepping the question of what claims the Union has that it could attempt to exhaust, the Court agrees that as a general matter, exhaustion is required. Plaintiffs don't convincingly argue otherwise or point the Court to cases in support. Instead, they argue that "Republic cannot simultaneously assert that it was never bound to the Local 130 CBA, and then argue that if Plaintiffs were to act against it, it could only be through the CBA's internal mechanisms." [Dkt. 193 at 4.] But the Court views Defendants' argument differently. They argue that the Union shouldn't be able to demand compliance with the CBA while not following its exhaustion provisions. That point is well taken.

Exhaustion is excused if attempting to pursue arbitration through the CBA would be futile. *Marine v. H.J. Mohr & Sons, Co.*, 2005 WL 2293673, at *10 (N.D. Ill. Sept. 19, 2005); *Stark v. PPM Am., Inc.*, 354 F.3d 666, 671 (7th Cir. 2004); *Springman*,

2009 WL 1089549, at *8. The *Springman* court found exhaustion excused because there was evidence that the defendant company had manifested its intent not to comply with CBA requirements. *Id.* In that case there was significant evidence that it failed to file reports, pay contributions or dues, and created "serial business entities to avoid paying contributions." *Id.* While this case is, in some respects, similar, Plaintiffs have failed to muster a compelling argument of futility. In fact, they don't make that argument at all.

Since the CBA expressly demands exhaustion with respect to disputes between the Union and employer and there is insufficient evidence of futility, the Court concludes that any potential claims the Union may have had with respect to contributions cannot proceed because it failed to exhaust. Summary judgment must be granted to Plaintiff on any Union claims.

Having decided that the Funds had no obligation to exhaust, the Court turns to the portion of the CBA that, Plaintiffs contend, binds Republic as U.S. Plumbing's successor. Section 14.1 of the CBA between U.S. Plumbing and the Union provides:

> This Agreement is binding upon the Employer regardless of whether he or it changes the name or address or his or its business and upon any other business entity within the trade and territorial jurisdiction of the Union which is owned, managed, controlled and/or operated by the Employer or its principals or any of them.

[Dkt. 180-4 at 45.]

In their brief, Plaintiffs walk through the elements of a breach of contract claim under Illinois law without discussing whether or why Illinois state law would provide the proper framework for a federal claim. [Dkt. 181 at 11–12.] Furthermore, they discuss whether there was a valid and enforceable CBA between the Union and U.S.

Plumbing. [*Id.*] Defendants make the same argument that there is no valid and enforceable contract [Dkt. 184 at 5, dkt. 190 at 10.]

But U.S. Plumbing's contribution obligations under the CBA was established in the predecessor case. [*Plumbers Pension Fund, Local 130, U.A. v. U.S. Plumbing & Sewer, Inc. et al.*, 18-cv-5277, Judgment in Civil Case, Dkt. 39. (October 25, 2019).] DiFoggio admitted liability for contribution arrearages owed by U.S. Plumbing. [*Id.*, *compare* dkt. 19 ¶¶ 10-11 *with* dkt. 31 ¶¶ 10–11 (admitting breach of CBA by U.S. Plumbing).] Defendants agreed that DiFoggio was on the hook, as the employer, to pay amounts U.S. Plumbing owed for contributions under the CBA. [*Id.*, dkt. 38.] Defendants also admit as much in this case, arguing in their reply brief that the $74,000 judgment against DiFoggio "was the total owed by U.S. Plumbing" for contributions. [Dkt. 194 at 2.] In other words, Defendants admitted the CBA was enforceable by agreeing to pay sums owed under it, even if they disputed U.S. Plumbing's responsibility to pay, as opposed to DiFoggio's, as a guarantor. The Seventh Circuit has instructed lower courts, particularly where "a case is transferred between district judges midway through litigation" not to "reconsider[] rulings made by the original judge." *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022). Adhering to that rule makes good sense especially in this case.

Even looking past Defendants' admission though, and as explained above, their termination and modification arguments are not persuasive. Defendants' additional argument that Plaintiffs failed to substantially perform under the CBA is a nonstarter for the same reason. *O'Donnell Plastering, Inc.*, 2003 WL 174207, at *6

(N.D. Ill. Jan. 27, 2003) (explaining that the Union's breach of the CBA "does not relief the employer of its obligations to make pension contributions"). Not to mention, Plaintiffs presented evidence of substantial performance: while U.S. Plumbing was in good standing, the Union provided workers for U.S. Plumbing jobs. [Dkt. 192 ¶ 27–32.]

Whether Republic is bound to the CBA through operation of Section 14.1 is an issue of contract interpretation. *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011) ("We approach our interpretive task in the collective bargaining agreement context in the same way we approach other contracts." (citation and internal quotation marks omitted)). Contract interpretation is a question of law. *ZF Boge*, 649 F.3d at 646. Here, the contract's meaning is plain and unambiguous so "there is no resort to extrinsic evidence, [and] no factual dispute to preclude summary judgment." *Id.*

The CBA binds not only the signatory employer, U.S. Plumbing, but "any other business entity within the trade and territorial jurisdiction of the Union which is owned … by the Employer or its principals." [Dkt. 180-4 at 45.] The parties agree that Republic is a "business entity within the trade and territorial jurisdiction of the Union." [Dkt. 192 ¶ 49.] DiFoggio was a "principal" of U.S. Plumbing by virtue of being a 50% owner, president, and director. [Dkt. 192 ¶¶ 7, 10.]. Principal, as a matter of both common knowledge and dictionary definition, means "a person who has controlling authority or is in a leading position." *Principal*, Merriam-Webster, https://www.merriam-webster.com/dictionary/principal#dictionary-entry-2 (last

visited May 29, 2025). It is undisputed that DiFoggio is the owner of Republic. Consequently, the plain meaning of Section 14.1 of the CBA establishes that Republic is bound by the terms of the CBA.

### ii. Illinois State Law Successor Claim

Count III of Plaintiffs' complaint is a successorship claim under Illinois law. Through this cause of action, Plaintiffs seek to hold Republic liable for the debts of U.S. Plumbing. [Dkt. 181 at 14.] While in briefing the parties dispute the applicability of several common law factors, they do not address the bigger issue: preemption.

"Common law successor liability rules do not apply to … ERISA claims," *Plumbers' Pension Fund, Loc. 130, U.A. v. Republic Piping Sys., Inc.*, 2020 WL 4437846, at *2 (N.D. Ill. Aug. 3, 2020). That is because "state law … successor liability, which cuts off the obligation to pay a predecessor's promised contributions, significantly conflicts with" the significant federal interest in "minimiz[ing] contribution losses." *Moriarty v. Svec*, 164 F.3d 323, 329 (7th Cir. 1998).

Instead, federal successor law applies to ERISA cases. *Id.* Courts apply the two factors from *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990). "[T]o hold a successor liable, [the Court] must find that there exist sufficient indicia of continuity between the two companies." *Id.* Second, the successor must have "had notice of its predecessor's liability." *Id.*; *see also Prather Plumbing & Heating, Inc.*, 3 F.4th at 956; *Indiana Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 777 (7th Cir. 2018).

Because Plaintiffs' Illinois state law successor claim is preempted by federal common law in the ERISA context, the Court grants judgment in favor of the

Defendants on Claim III. *See e.g.*, *Vesely v. Cont'l Cas. Co.*, 101 F. Supp. 2d 1054, 1055 (N.D. Ill. 2000) (granting judgment on preempted claim).

### 3. Piercing Corporate Veil

Count IV seeks to pierce the corporate veil and hold DiFoggio liable for any judgment against Republic. [Dkt. 181 at 15.] Since summary judgment is proper for Plaintiffs on their § 301 contract interpretation claim, the Court considers whether DiFoggio is on the hook for debts owed by Republic.

Normally, "[c]orporations exist separately from their owners" and, as a result, "owners typically are not responsible for the liabilities of the corporation." *Plumbers' Pension Fund Loc. v. Only Plumbing 2, Inc.*, 2022 WL 17668607, at *4 (N.D. Ill. Dec. 14, 2022) (cleaned up). Courts "pierce the corporate veil" where "an individual or entity uses the corporation merely as an instrumentality to conduct that person's or entity's business." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). "The point is to prevent those who disregard the corporate form from then relying on it to avoid liability for their wrongdoing." *Id.*

"Courts may pierce the corporate veil … where the corporation is so organized and controlled by another entity that maintaining the fiction of separate identities would sanction a fraud or promote injustice." *Only Plumbing 2, Inc.*, 2022 WL 17668607, at *4 (citation omitted). Illinois courts pierce the corporate veil when two factors are met: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation

would promote injustice or inequitable circumstances." *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 13.

### i. Unity of Interest and Ownership

Courts consider a variety of factors when determining whether there is a unity of interest. They include

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.

*Only Plumbing 2, Inc.*, 2022 WL 17668607, at *5.

By and large, these factors weigh in favor of piercing the corporate veil. The evidence shows Republic doesn't observe any corporate formalities, never had an annual meeting, kept a corporate book, or paid dividends. [Dkt. 192 ¶¶ 121–124.] There is no evidence of other officers or directors; DiFoggio is "pretty much in charge of everything" at Republic. [*Id.* ¶ 50–52, 120.] DiFoggio treats Republic's funds as his own, drawing from Republic's accounts to pay for numerous personal expenses. [*Id.* ¶ 93–113.] He does not draw a salary from Republic. [*Id.* ¶ 92.] He also added his girlfriend, Duarte as a co-signor on Republic's account as collateral for a personal loan she made to DiFoggio. [*Id.* ¶ 87–88.] As the court noted in *Only Plumbing 2, Inc.*, "the money sloshed back and forth as if everything was in one big pot." 2022 WL 17668607, at *6.

34

Other factors map less neatly onto this scenario. For example, inadequate capitalization. While DiFoggio's paid-in capital to Republic was just $1, the first deposit into Republic's account was $10,000, coming primarily in the form of a loan from DiFoggio's aunt. [Dkt. 192 ¶¶ 115–16.] This amount does not suggest that Republic "has so little money that it cannot operate its business on its own." *Lay-Com, Inc.*, 580 F.3d at 612. What is unclear though is whether that money was a loan for the business or for DiFoggio personally. DiFoggio admitted he "needed to obtain the loan from his aunt because, at the time, he was barely surviving, and didn't have money for his mortgage." [Dkt. 192 ¶ 117.] Regardless, the fact that DiFoggio's personal bank account had $200 [*id.* ¶ 83] and given his use of Republic's account to pay for a vast number of personal expenses [*id.* ¶ 93–113], the evidence shows a high level of financial intermingling. From any vantage point, there is "a unity of interest." *Plumbing 2, Inc.*, 2022 WL 17668607, at *7.

DiFoggio's response brief cops to the substantial overlap between himself and Republic. Seeming to ignore the bedrock principal that even owners of solely owned corporations are "typically are not responsible for the liabilities of the corporation," *id.* at *4, DiFoggio argues that, as sole owner of Republic he "would ultimately be the party paying the judgment," [dkt. 190 at 13]. In so doing, he seems to admit that there is no real distinction between himself and his company. That fact is confirmed by Plaintiffs' evidence which, by and large, Defendants do not challenge.

### ii.    Injustice or inequitable circumstances

Under the second factor, courts "must determine whether the circumstances are such that adherence to the fiction of a separate corporation would promote

injustice or inequitable circumstances." *Buckley*, 2014 IL App (1st) 130469, ¶ 34. While "the rule … is not clearcut," *Lay-Com, Inc.*, 580 F.3d at 611, "this prong requires something less than an affirmative showing of fraud, but something more than the mere prospect of an unsatisfied judgment," *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 756 (7th Cir. 2012) (cleaned up). "The Seventh Circuit has observed that the corporate veil has been pierced to, among other things, prevent unfair enrichment …; keep a party from escaping responsibility or ignoring obligations …; and prevent manipulation of corporations to the benefit of one and the detriment of another." *In re Tolomeo*, 537 B.R. 869, 879 (Bankr. N.D. Ill. 2015), *adopted sub nom. In re: Tolomeo*, 2015 WL 8741730 (N.D. Ill. Dec. 15, 2015)

Cases like *Wachovia Securities* and *Lay-Com* conduct veil piercing analyses to untangle more complex corporate arrangements, where one corporation is used to plunder the assets of another. *Wachovia Securities*, 674 F.3d at 753. By contrast, Republic's simple corporate form lends itself to a simple unjust enrichment analysis. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 381 n.1 (7th Cir. 2008). "[T]he uncontested facts establish that" DiFoggio and Republic "operated as a single economic unit with a single economic identity." *In re Tolomeo*, 537 B.R. at 879.

Not piercing the corporate veil would allow for DiFoggio to "leave [Republic] holding the bag" and avoid the responsibility to pay contributions in accordance with the CBA. *Wachovia Sec., LLC*, 674 F.3d at 753. Under the circumstances present in this case, it would be inequitable to permit DiFoggio, by creating Republic, to dodge

Republic's responsibilities under the CBA. *See Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1314 (7th Cir. 1987) (discussing in context of alter ego analysis that "[f]ederal labor policy cannot tolerate such easy avoidance of collective bargaining obligations."); *see also In re Tolomeo*, 537 B.R. at 879 ("Failure to pierce the corporate veil under the circumstances here would allow the Debtor to shield assets…").

In briefing DiFoggio argues that, regardless of any veil piercing, he's on the hook for any judgments on Republic. If that was true, any injustice would be minimal; he wouldn't be unjustly enriched. In actuality, absent veil piercing there's no legal responsibility for DiFoggio to step up to pay Republic's debts. Republic's corporate form could be used as a shield to deflect liabilities caused by DiFoggio's management. *Wachovia Sec., LLC*, 674 F.3d at 753. DiFoggio's statement to the contrary in briefing isn't a judgment Plaintiffs can enforce. Veil piercing is appropriate in this case.

## IV. Conclusion

For the reasons stated above, Plaintiffs' Motion for Summary Judgment [dkt. 179] is granted in part and denied in part. Defendants' Motion for Summary Judgment [dkt. 182] is also granted in part and denied in part. Plaintiffs' motion is granted with the exception of (1) claims brought by the Union, (2) Plaintiffs' alter ego theory of relief, (3) their Illinois state law successor claim, and (3) their claims against Duarte. Defendants' motion is granted with respect to (1) the Union's claims, (2) Plaintiffs' state law successor in interest claim, and (3) Plaintiffs' claims against Duarte. It is denied in all other respects. Defendants' motion for sanctions [dkt. 185] is also denied.

Enter: 20 CV 774
Date: May 30, 2025

_____
Lindsay C. Jenkins